AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| United States of America | ) | |
| v. | ) | |
| TUSHAR TAMBE | ) | Case No. |
| | ) | |
| | ) | 4-11-70369 |
| _Defendant(s)_ | ) | |

FILED
APR - 8 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND
MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 11, 2010 _____ in the county of _____ Alameda _____ in the
_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1546(a) | Visa Fraud |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

APPROVED AS TO FORM:

_Wm Ry___

WADE M. RHYNE, AUSA

_____
_Complainant's signature_

ICE SA Jason Mackey
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __4/8/11__

_____
_Judge's signature_

City and state: _____ Oakland, California _____

Donna M. Ryu, U.S. Magistrate Judge
_Printed name and title_

Document No.
District Court
Criminal Case Processing

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re:  TUSHAR TAMBE

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jason Mackey, do swear and affirm as follows:

## I.    INTRODUCTION AND PURPOSE FOR AFFIDAVIT

1.     I make this affidavit in support of a criminal complaint and summons against Tushar TAMBE for visa fraud, in violation of Title 18, United States Code, Section 1546(a). The statements contained in this affidavit are based on my experience and training as a Special Agent and the information provided to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of securing a complaint and summons, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause that TAMBE violated Title 18, United States Code, Section 1546(a).

## II.   AGENT BACKGROUND

2.     I have been a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), or its predecessor agency, the United States Customs Service, since November 2002.  Since April 2009, I have been assigned to the Document and Benefit Fraud Task Force for the San Francisco, California, Office of the Special Agent in Charge.  Previous assignments include the Joint Terrorism Task Force (2007-09), the Compliance Enforcement Unit (2006-07), the Benefit Fraud Unit (2004-06), and the Contraband Smuggling Group (2002-04).

1

3.      Since 2004, I have participated in at least 50 visa fraud investigations, including three involving educational institutions; have interviewed hundreds of aliens suspected of violating United States immigration laws; and have been involved in approximately 50 arrests for student visa violations.

4.      In addition to completing the Criminal Investigator Training Program and the Customs Basic Enforcement School at the Federal Law Enforcement Training Center (2003), I have received extensive training in enforcing immigration laws and investigating immigration benefit fraud schemes. Specifically, I have participated in the Customs-Immigration Cross Training Program (2004), ICE's National Security Investigations Western Region Training Conference (2008), and ICE's Document Fraud and Terrorism course (2010). From these trainings, I learned about the common indicators of visa fraud and student visa status violations.

5.      I have also discussed this investigation with an ICE adjudicator assigned to the Student Exchange and Visitor Program (SEVP) School Certification Branch, who has been involved in the inspections of at least twenty-seven SEVP-approved schools. From these discussions, I know that all U.S. schools must file a petition and be approved by SEVP before they can sponsor foreign nationals to receive student status to enter and remain in the United States. SEVP approval is contingent upon a petitioning school's agreement to abide by certain regulations that require, among other things, reporting of foreign student residence addresses and failure of foreign students to maintain full courses of study. A school that does not comply with the reporting requirements may have its sponsorship privileges revoked.

6.      As a result of this training and experience, I am familiar with the United States' immigration laws and regulations, including those relating to student visas and status violations.

2

I am aware that an alien who has entered the United States on a valid student visa may become removable if that alien fails to comply with the visa terms. I know that there is a very high demand for student visas, and that some people seek such visas and visa-related documents as a means entering and remaining in the United States, without ever intending to pursue a full course of study. I also know that some schools seek to profit from the demand for student visas by issuing visa-related documents and falsely reporting students' status to DHS in exchange for "tuition" fees.

## III.    **APPLICABLE LAW**

7.    Title 18, United States Code, Section 1546(a) makes it a criminal offense to "knowingly forge[] . . . or falsely make[] any . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay . . . in the United States," or to "use[], attempt[] to use, posses[], obtain[], accept[], or receive[]"any such document, "knowing it to be forged . . . or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." 18 U.S.C. § 1546(a).

8.    The Immigration and Nationality Act identifies several categories of foreign nationals who may be admitted to the United States for non-immigrant purposes. *See* 8 U.S.C. § 1101. One such category, designated "F-1," comprises "bona fide student[s]" coming temporarily to study at an approved school. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.1(a)(2). Those entering the United States on an F-1 student visa are admitted for a temporary period called "duration of status," meaning "the time during which an F-1 student is pursuing a full course of study" at an approved school. 8 C.F.R. § 214.2(f)(5)(i). When a student stops pursuing a full course of study, the duration of status ends and the temporary period for which the

3

individual was admitted expires.

9.      To enter the United States on a student visa, a foreign national must present a

Certificate of Eligibility, also known as a Form I-20, certifying that the student has been accepted

for enrollment in a full course of study and signed by a Designated School Official (DSO). 8

C.F.R §§ 214.2(f)(1)(i)(a), 214.3(k). Once a student has been granted F-1 status using this

"initial" I-20, DSOs are obligated to report within 21 days, the failure of any student "to maintain

status." 8 C.F.R. § 214.3(g)(3)(ii)(A). A "student is considered to be maintaining status if he or

she is making normal progress toward completing a course of study." 8 C.F.R. § 214.2(f)(5)(i).

Such status is documented through an "active" I-20. Physical attendance is required. *See* 8

C.F.R. § 214.2(f)(6)(i)(G). An approved school is obligated to report "the termination of

attendance of each nonimmigrant student." 8 U.S.C. § 1101(a)(15)(F)(i). All such reporting is

conducted through a DHS-operated electronic database of non-immigrant aliens' status, known

as the Student and Exchange Visitor Information System (SEVIS).

## IV.    FACTS ESTABLISHING PROBABLE CAUSE

### .A.    **The Tip**

10.      On May 7, 2010, ICE's telephone tip-line received a call from someone, whom I

will identify as Cooperating Witness (CW) 1, identifying himself as a student at TRI-VALLEY

UNIVERSITY (TVU) and reporting that TVU's president, Susan SU, was providing F-1 students

with unauthorized access to SEVIS.

11.      I interviewed CW1 on May 12, 2010. During the interview, CW1 advised that he

had transferred to TVU, that SU signed his Form I-20 using the name "Sophie Su," and that, after

trying to register for classes online, he learned that TVU has no physical classes – they are all

4

online. CW1 further advised me that TVU has hundreds of foreign national students, that most use the school only to maintain their student visa status, that students are regularly given access to SEVIS, and that they get referral fees for referring additional students. CW1 said that, after repeatedly asking SU when TVU would begin holding physical classes, SU accused him of claiming illegitimate referral fees and terminated his active status. SEVIS records show CW1's entry into active status at TVU in March 2010, and his termination from active status on May 25, 2010, reportedly for failure to re-enroll. SEVIS login records confirm access from an internet protocol address not associated with a DSO.

**B.    The Investigation**

12.    In response to CW1's tip, I reviewed TVU's records in SEVIS and noted the following. On February 17, 2009, TVU received approval on its Form I-17, thus allowing foreign student attendance. The DHS site visit as part of the approval process confirmed capacity for approximately 30 students. TVU had 11 active F-1 students by May 2009, 75 by September 2009, 447 by January 2010, and 939 by May 2010. More than 95% of the students in active status were citizens of India. And more than half of the students were reported to be residing at 555 E. El Camino Real, Apartment 415, Sunnyvale, California. The lease agreements for this apartment identify four TVU F-1 students living there between June 2007 and August 2009, and none since.

13.    The contractor who conducted the TVU site visit has advised me that SU showed him a campus at 4455 Stoneridge Drive in Pleasanton, California, including office space as well as several classrooms, a library, and a computer lab. The site visit contractor reported that SU told him he could not observe any classes during the visit because TVU was only offering night

5

classes at that time.

14.     Meanwhile, the owner of 4455 Stoneridge informed me that he had authorized SU in 2008 to use one small office and an adjoining room, in the evenings, for the purpose of starting an online school. He explained that SU had moved out at his request in 2009, when he had decided to sell the property.

15.     I have also interviewed a current TVU student, CW2, who stated that he transferred to TVU in February 2010, but never took any classes. During the first interview, CW2 said that SU signs the I-20s in the name of her sister (Sophie Su) and sister's husband. CW2 also explained that TVU reports in SEVIS that most of its foreign students live at 555 El Camino Real, Apartment 415, in order to conceal that they do not live in California.

16.     A couple of weeks later, CW2 requested to be re-interviewed, stating that he was not fully forthcoming during the first interview. During the second interview, CW2 reported that he worked in TVU's office, and that CW1 had also worked there until SU fired him for diverting prospective applicants to claim referral fees. CW2 advised that none of the school's purported DSOs, aside from SU, actually works in the office. Rather, SU staffs it with foreign students who use DSO passwords to access SEVIS, enter updates, and print I-20s; SU then signs in the names of the DSOs from whose SEVIS accounts the forms were printed. CW2 reported having seen SU sign initial I-20s, indicating TVU's admission acceptance, for foreign transfer students whose active status had previously been terminated in SEVIS. CW2 further reported having heard SU instruct other foreign student-employees to create academic transcripts using only grades of B+ or higher.

6

## C.     Undercover Operations

17.     On August 4, 2010, with CW2's consent, I sent an email from an account that appeared to belong to CW2 to one of SU's accounts at TVU, sus@trivalleyuniversity.org. Purporting to be CW2, I represented that I knew a Pakistani national named "M.R." whose F-1 status in SEVIS had been terminated by another school. I attached to the email an admissions application for M.R., listing M.R.'s home address as "New York," and requesting M.R.'s enrollment in TVU's Bachelors of Science in Electrical Engineering (BSEE) program. I listed two colleges in the educational history section of the application, but did not attach any transcripts, diplomas, test scores, or other evidence of academic qualifications.

18.     On August 11, 2010, CW2 entered the TVU office -- which had relocated to 405 Boulder Court, Pleasanton, California -- wearing an audio and video recording device. CW2 met with SU, and inquired into the status of M.R.'s application. In response, SU directed CW2 to see "Jimmy" (later identified as Tuschar TAMBE). CW2 walked over to TAMBE and advised him that SU had sent him, that M.R. had been terminated in SEVIS, and that M.R. thus needed a new initial I-20. TAMBE directed CW2 to take a seat while he accessed SEVIS and created the I-20. TAMBE entered M.R.'s information in SEVIS, printed the I-20, and handed it to CW2. CW2 then walked the I-20 to SU, who signed it and handed it back to CW2. CW2 departed the office with the I-20, and gave it to me.

19.     Another TVU office worker activated M.R.'s SEVIS record on August 31, 2010, after CW2 paid $1,000; the record reflected that M.R. was pursuing a BSEE and residing in Sunnyvale, California. Subsequent SEVIS queries revealed that TVU maintained M.R. in active status despite M.R. never attending a single class.

7

20.     On January 7, 2011, an ICE agent called the TVU office and spoke to a woman
who identified herself as Susan SU. The agent advised SU that he worked for immigration at the
John F. Kennedy International Airport in New York and had stopped M.R. attempting to enter
the United States from Pakistan. The agent explained that he needed TVU to confirm whether
M.R. was a bona fide student and requested a copy of his I-20, a letter of good standing, a copy
of his transcripts, and attendance records. Later that same day, the agent received an email from
SU attaching all but the attendance records. Shortly thereafter, an ICE agent met SU at TVU
and, representing that there had been an email failure, collected the records directly from SU.
Regarding M.R.'s attendance records, SU advised the agent that she did not have them available,
but that she personally taught a class to M.R. and vouched for his attendance.

21.     On January 18, 2011, ICE officials terminated M.R.'s F-1 status in anticipation of
the withdrawal of TVU's certification to admit nonimmigrant students.

22.     TAMBE's knowledge of the fraudulent nature of the I-20 is supported by a
separate transaction on September 7, 2010. On that date, an ICE Undercover Agent (UCA)
entered TVU's offices posing as a prospective foreign student. The UCA was equipped with an
audio and video recording device. After entering, the UCA was introduced to an office worker
with whom the UCA conversed in Hindi. The UCA advised the worker that his F-1 visa had
expired in 2002 because he never went to school, that he was now "completely out of status," and
that he feared being deported. The office worker created an I-20 for the UCA and advised that he
would need to have it signed by SU, who was out of the office. TAMBE, seated a few feet away
during the entire conversation between his coworker and the UCA, introduced himself to the
UCA as "Jimmy," gave the UCA his phone number, and told him to call later to find out if SU

8

had signed the I-20 yet. When the UCA returned later that day, he advised TAMBE that "I do two jobs and I will not be able to come here frequently." TAMBE informed the UCA that he would still get a "certificate." In response to the UCA's inquiry whether SU understood what was going on at TVU, TAMBE stated, "We know what's going on here. . . . There will be no problem."

23.     On January 19, 2011, an ICE agent conducted a consensual interview of TAMBE. TAMBE admitted that TVU was a sham university, that transcripts were issued fraudulently, and that he himself had never attended classes at TVU despite being enrolled as a F-1 student. I have confirmed that SEVIS reflected TAMBE's active F-1 status until ICE terminated that status on January 18, 2011, in anticipation of the withdrawal of TVU's certification to admit nonimmigrant students.

## V.     CONCLUSION

24.     Based on the above information, there is probable cause to believe that on August 11, 2010, in the Northern District of California, Tushar TAMBE did knowingly and falsely make a Form I-20, which is a document prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, in violation of Title 18, United States Code, Section 1546(a).

## VI.     REQUEST FOR SEALING ORDER

25.     The investigation regarding Tri-Valley University, Susan SU, and other subjects is ongoing. Disclosure of this affidavit and the criminal complaint may result in the destruction of evidence, witness tampering, and/or the flight of TVU student-witnesses. Indeed, several former TVU students who may be potential witnesses have already returned to their native countries.

9

Accordingly, I request that the Court direct the Clerk of the Court to maintain this affidavit and criminal complaint under seal.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Jason G. Mackey, Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement

Sworn and subscribed to before me this _____ day of April, 2011.

HON. DONNA M. RYU
United States Magistrate Judge

10